Filed 9/12/14  P. v. Bell CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B251634 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA099178) |
| v. | |
| DONELL ROBERT BELL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert M. Martinez, Judge.  Affirmed in part, and reversed in part with directions.

Jean Ballantine, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, James William Bilderback II, Supervising Deputy Attorney General, and Marc A. Kohm, Deputy Attorney General, for Plaintiff and Respondent.

_____

A jury convicted defendant and appellant Donell Robert Bell of six counts of attempted carjacking (Pen. Code, §§ 664, 215, subd. (a) [counts 1-4; 12-13]),[1] three counts of criminal threats (§ 422, subd. (a) [counts 6-7; 9]), second degree robbery (§ 211 [count 8]), four counts of carjacking (§ 215, subd. (a) [counts 10; 17-19]), evading an officer with willful disregard (Veh. Code, § 2800.2 [count 11]), attempted second degree robbery (§§ 664, 211 [count 14]), unlawful vehicle taking (Veh. Code, § 10851, subd. (a) [count 15]), attempted first degree burglary (§§ 664,459 [count 16]), two counts of assault with a deadly weapon, a car (§ 245, subd. (a)(1) [counts 20-21]), and two counts of misdemeanor resisting arrest (§ 148, subd. (a)(1) [counts 22-23]).[2] With respect to counts 1-4 and 17-19, the jury found true the allegations of personal use of a firearm (§ 12022.53, subd. (b)), and principal armed with a firearm (§ 12022, subd. (a)(1)). In a separate proceeding, the trial court found true the allegations that, with respect to counts 1-4 and 6-21, defendant suffered four prior convictions under the three strikes law (§§ 1170.12, subds. (a)-(d), 667, subds. (b)-(i)), three serious felony priors (§ 667, subd. (a)(1)), and served four prior prison terms (§ 667.5, subd. (b)).

The trial court sentenced defendant to a total of 437 years-to-life in state prison. Defendant was awarded 381 days of custody credits. Defendant filed a timely notice of appeal.

Defendant contends the prosecutor exercised peremptory challenges to black jurors in violation of the principles in *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) and *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*). He also argues two counts are not supported by substantial evidence, the trial court erred in failing to sua sponte instruct on accident in connection with one set of offenses, the prosecutor committed misconduct by

---

[1] All further statutory references are to the California Penal Code, unless otherwise specified.

[2] Defendant was found not guilty of attempted carjacking in count 5.

misstating the definition of reasonable doubt, and presentence custody credits were miscalculated.

We reverse defendant's conviction for criminal threats in count 7, and order that defendant's presentence custody credits be corrected. The judgment is affirmed in all other respects.

## FACTS

*Prosecution Evidence*

### Counts 15-19

On the evening of August 23, 2012, Ivette Valenzuela and her children were getting into their car. Defendant threatened them with a gun. He demanded the car keys and Valenzuela's purse. Valenzuela complied, the children got out of the car, and defendant drove away.

### Counts 1-3

Around 7:40 p.m. on August 24, 2012, Anthony Holguin and his friends Desiree Solis and Kenn Watanabe-Roland were driving in La Verne when Holguin saw defendant crash Valenzuela's car into the curb. Holguin parked his car and walked approximately 20 yards to the crashed car to see if defendant was alright. Defendant got out of Valenzuela's car, fired a gun that he held in his pocket, and walked toward Holguin's car.[3] Holguin yelled at his friends to run. Defendant climbed into the driver's seat of Holguin's car, brandished the gun, and ordered Solis and Watanabe-Roland to get out.

---

[3] Defendant may have shot himself in the leg in the process.

3

They fled the vehicle. Defendant was unable to start the car because Holguin still had the keys. Holguin and his friends ran to a nearby police station.

**Count 16**

Defendant then went into the backyard of Randy Allison's house, which was nearby. He tried to open the back door, but ran when the residents spotted him. Allison called the police.

**Count 23**

A few minutes later, La Verne Police Officers Erin Hess and Samuel Gonzalez saw defendant running. The officers, who were in uniform and driving a marked patrol car, got out of their car and pursued defendant on foot as he climbed fences and ran through yards. Hess ordered defendant to stop. When he refused, she discharged her Taser at him, but missed. Defendant fled.

**Counts 4-7**

Laysa Lopez and her friend Angela Wall were standing in a parking lot next to Lopez's car when they heard the police ordering defendant to stop. Defendant approached the women. He demanded that Lopez give him the keys to her car, and threatened to kill Lopez when she said she did not have them. Lopez and Wall ran.

**Counts 8-10**

Defendant then entered the home of Gerald McQuade, demanded his car keys, and threatened to shoot him. McQuade said the keys were in the car. Defendant left the house, holding McQuade around the neck. Officers Hess and Gonzalez spotted defendant

4

from their patrol car as he was getting into McQuade's car. They tried to block the driveway with the patrol car, but defendant maneuvered around the vehicle and sped away.

**Count 11**

La Verne Police Corporal Shawn Dinkle, also in uniform and driving a marked patrol car, saw defendant pull out of the driveway. Corporal Dinkle activated his car's light bar and pursued defendant. A high speed chase ensued, during which defendant violated numerous laws, including driving 70 miles per hour in a residential zone. Defendant evaded Corporal Dinkle, who lost sight of him.

**Counts 12-13 and 20-21**

Around 7:50 p.m., Joselin Fuentes and her neighbor, Juventina Villagomes, were standing next to Fuentes's van, which had broken down. Fuentes's children were still inside. Defendant sped directly at the women. He missed hitting them only because they were able to jump out of the way. Defendant exited McQuade's car, entered the van, and ordered the children to get out. He attempted to start the van, but left after realizing it was inoperable. He approached several vehicles at a nearby intersection, attempting to open the doors, but then continued on foot.

**Count 14**

A few minutes later, Daniel Varelas came out of a nearby market, and was counting his money. Defendant said he had a gun and demanded the money. Varelas refused and a fistfight ensued. Defendant left. He was arrested a short time later. He had a gunshot wound to his leg.

*Defense Evidence*

At the time of his arrest, defendant had suffered a gunshot wound to his leg and had cocaine and alcohol in his system.

**DISCUSSION**

*Batson/Wheeler Motions*

Defendant contends the trial court committed reversible error under *Batson, supra,* 476 U.S. 79, and *Wheeler, supra,* 22 Cal.3d 258, by finding no prima facie case of discrimination after the prosecutor's use of peremptory challenges to excuse a total of three black male jurors during jury selection. We disagree.

The *Wheeler* court held that a prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group membership violates a criminal defendant's right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution. (*Wheeler*, *supra*, 22 Cal.3d at pp. 276-277.) *Batson* held, among other things, that such a practice violates a defendant's right to equal protection of the laws under the United States Constitution's Fourteenth Amendment. (*Batson*, *supra*, 476 U.S. at p. 97.) The *Batson/Wheeler* principles apply to peremptory challenges excusing jurors improperly on the basis of race, gender, or ethnic grounds. (*United States v. Martinez-Salazar* (2000) 528 U.S. 304, 315; *People v. Willis* (2002) 27 Cal.4th 811, 813-814.)

The standard for reviewing a *Batson/Wheeler* motion is well established. State and federal constitutional authority imposes a three-step inquiry: "First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge based on race. Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason. Third, the court determines whether the defendant

6

has proven purposeful discrimination.  The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.  (*Rice v. Collins* (2006) 546 U.S. 333, 338.)"  (*People v. Lenix* (2008) 44 Cal.4th 602, 612-613 (*Lenix*).)

Our review of a trial court's ruling on a *Batson/Wheeler* motion is deferential, meaning that we examine "only whether substantial evidence supports its conclusions." (*Lenix*, *supra*, 44 Cal.4th at p. 613, citing *People v. Bonilla* (2007) 41 Cal.4th 313, 341-342.)  We therefore exercise great restraint in reviewing a lower court's determination of the sufficiency of the moving party's reasons for making peremptory challenges.  (*Lenix*, *supra*, at pp. 613-614.)  "A party has an absolute right, within statutory limits, to excuse a prospective juror for any nondiscriminatory reason, however subjective, that gives the party concern about the juror's suitability.  We presume this right is exercised in good faith, and the burden is always on the party claiming discrimination to establish it.  When the trial court has inquired into the basis for an excusal, and a nondiscriminatory explanation has been provided, we also assume the court understands, and carries out, its duty to subject the proffered reasons to sincere and reasoned analysis, taking into account all the factors that bear on their credibility.  Finally, we recognize that the trial rather than the appellate court is best suited to determine, under all the relevant circumstances, whether the proffered reasons are likely the real ones."  (*People v. Hung Thanh Mai* (2013) 57 Cal.4th 986, 1049, fn. 26.)

### First *Batson/Wheeler* Motion

Defendant's first *Batson/Wheeler* motion challenged the peremptory challenges to Prospective Jurors 7859 and 4901.

Prospective Juror 7859, originally seated as Juror number 1, was an unmarried black male with no children who lived in Pomona, and had no prior jury experience.  He worked as a high-end condominium security officer for a condominium complex in Beverly Hills.  Prospective Juror 7859 graduated from the Fullerton Police Academy and served as an Associate Probation Officer in San Bernardino County.  He had no concerns

about sitting on the jury. He had a doctor's appointment the day after voir dire at 8:15 a.m. He did not know how long the appointment would take, but it could be rescheduled.

Prospective Juror 4901, originally seated as Juror number 18, was a married black male with two adult children in school. He was a teacher and his wife was a social worker. He had prior jury service in a civil trial several years before the instant trial, in which the jury was dismissed. He had no friends or family in law enforcement. He was concerned about serving because his home had been burglarized in the past and because he was scheduled to begin teaching classes the following Tuesday. He felt it would be a problem to serve on the jury because he was not yet prepared for the first day of school and wanted to be there so that his students would be prepared and ready.

The prosecutor moved to strike Prospective Jurors 7859 and 4901, among others. Defense counsel made a motion for mistrial, on the basis that the prosecution had dismissed the only two black jurors who had been empanelled. Defense counsel offered that he believed the prosecution would assert that the two jurors were dismissed on the basis of hardship—Prospective Juror 7859 because of an upcoming doctor's appointment and Prospective Juror 4901 because his first day of teaching school would likely occur on the last day of the trial. Defense counsel asserted these were pretextual reasons for dismissal.

The trial court verified that its notes contained the scheduling conflicts defense counsel cited for each juror, and said to the prosecutor, "I don't know if you want to be heard or not." The prosecutor responded, "That would be primarily – for juror 4901, it is because of the fact that he is starting school on Tuesday; and I can understand the reason why he would want to be there for his first day of school. [¶] As to juror no. 1, 7859, not only does he have the doctor's appointment, it was a little bit [concerning] for the people that he is a graduate of a law enforcement academy, has experience in the probation office and yet is working as a security officer. That was the reason for the – why the people excused both of those jurors."

The trial court ruled: "The court is going to deny the motion for a mistrial or any other sanctions based on systematic exclusion. If anything, the exercise of peremptories

8

indicates an accommodation for jurors who specifically requested some hardship, what could be . . . seen as hardship."

The trial court made no explicit ruling whether defendant made a prima facie showing that the prosecutor exercised a peremptory challenge based on race. However, the prosecutor identified nondiscriminatory reasons for exercising each peremptory challenge, so it is unnecessary for us to determine whether defendant established a prima facie showing of a discriminatory purpose. (*People v. Riccardi* (2012) 54 Cal.4th 758, 786-787.) "'Accordingly, we express no opinion on whether defense counsel established a prima facie case of discrimination and instead skip to *Batson*'s third stage to evaluate the prosecutor's reasons for dismissing [the] African-American prospective jurors.' [Citations.]" (*Id*. at p. 787.)

We conclude that the trial court properly accepted the race-neutral reasons for dismissal. Prospective Juror 7859 stated that he had a conflicting appointment the next morning. Although he also said that the appointment could be rescheduled the prosecutor had the additional concern that Prospective Juror 7859 was working as a security guard despite having graduated from the police academy and having previous employment in law enforcement. These facts could indicate bias against law enforcement, and combined with the added inconvenience to Prospective Juror 7859 of rescheduling an appointment, could cause the prosecutor to question the prospective juror's impartiality. With respect to Prospective Juror 4901, the inconvenience of serving on the jury was significant. He had not yet prepared for school and classes were set to begin during the trial. The prospective juror's commitment to the opening of the school year went beyond a single appointment for himself that could be rescheduled. The trial court's determination that the expressed reasons were valid as to both prospective jurors was proper.

**Second *Batson/Wheeler* Motion**

Defendant's second *Batson/Wheeler* motion was directed at the peremptory challenge of Prospective Juror 0383.

9

Prospective Juror 0383, originally seated as Juror number 13, and later seated as Juror number 5, was a divorced black male with one adult daughter. He had served on a jury once, but the jury did not reach a verdict. Prospective Juror 0383 was in the minority on the hung jury. The prospective juror had a doctor's appointment scheduled for Friday. He believed it was at 11:00 a.m., but the doctor's office had changed the time. He said he could try to change the appointment, but it was in connection with a worker's compensation case against the bus company he drove for and the company was anxious to close the case.

When the prosecution exercised a peremptory challenge to Prospective Juror 0383, defense counsel made a second motion for mistrial, stating that Prospective Juror 0383 was the last seated black juror, with only a single remaining black woman in the jury pool. The prosecution responded that Prospective Juror 0383 had indicated that he had prior jury experience on a hung jury and had been in the minority. Prospective Juror 0383 also had a doctor's appointment at 11:00 a.m. that would be harder to accommodate than an early morning appointment, and was in the midst of a lawsuit against his employer. The prosecutor also noted that there was another remaining black male amongst the prospective jurors.

The trial court confirmed that its notes indicated the juror had an appointment coming up for a worker's compensation case, and that it might be difficult to change the appointment because the company wanted to close the case. It denied the *Batson/Wheeler* motion and sanction of mistrial, stating: "The prosecutor has several times asked jurors if they had appointments or commitments that are coming up that might conflict with jury duty. She has accommodated some of those, and even though she has excused two black gentlemen and now a third, each appears to be an accommodation that has not extended exclusively to African Americans but has been extended to other jurors as well."

Once again, the trial court's acceptance of the prosecutor's race-neutral reasons for excusing the prospective juror was not improper. Prospective Juror 0383 was in the minority on a hung jury, a race-neutral fact which unquestionably is a reasonable ground

10

for a prosecution's peremptory challenge. The prosecution also had concerns about the timing and nature of the prospective juror's medical appointment. Under these circumstances, we cannot conclude that the reasons given were pretextual.

**Comparative Analysis of Prospective Jurors on Appeal**

Defendant also requests that we make a comparative analysis of unchallenged prospective jurors for the first time on appeal. In *Lenix*, *supra*, 44 Cal.4th 602, the court explained the manner in which we should undertake a comparative juror analysis when it has not been raised below. "When a comparative juror analysis is undertaken for the first time on appeal, the prosecutor is never given the opportunity to explain the differences he perceived in jurors who seemingly gave similar answers." (*Id*. at p. 623.) "Defendants who wait until appeal to argue comparative juror analysis must be mindful that such evidence will be considered in view of the deference accorded the trial court's ultimate finding of no discriminatory intent. (See *Hernandez v. New York* [(1991)] 500 U.S. [352,] 365.) Additionally, appellate review is necessarily circumscribed. The reviewing court need not consider responses by stricken panelists or seated jurors other than those identified by the defendant in the claim of disparate treatment. Further, the trial court's finding is reviewed on the record as it stands at the time the *Wheeler/Batson* ruling is made." (*Lenix*, *supra*, at p. 624.)

Our review of the record demonstrates that a comparative review adds nothing of substance to defendant's *Batson/Wheeler* argument. Defendant first identifies Prospective Juror 4261, who was seated as juror number 4. Defendant argues that Prospective Juror 4261, who was not black, had a conflicting appointment that was not accommodated, whereas the three black prospective jurors who were challenged were accommodated. Prospective Juror 4261 stated that her son had an important G.I. appointment on the same day that Prospective Juror 4901 was to start teaching classes. She "just made [the appointment] yesterday," but had "been waiting for him to get [it]," and felt it would be "really important" for her to be there with her son. She did not state

11

whether the appointment could be rescheduled, but her desire to be there indicated that at the very least she would prefer not to reschedule it. Prospective Juror 4261's conflict differed from the challenged jurors' conflicts in important respects. First, the doctor's appointment was for her son, and not the prospective juror. She stated that she had a husband and an adult son, and said nothing to indicate that someone else would be unable to take her son to the appointment or that it was necessary for her to be present. Nor did she state whether the son in question was a minor and would require transportation or accompaniment. In the case of the challenged jurors, each had a personal commitment. Prospective Jurors 4901 and 0383 had commitments that directly involved other parties who would be adversely affected—students and an employer involved in a worker's compensation suit. Second, Prospective Juror 4261 had no employment or educational history that would lead the prosecution to question her impartiality (as had Prospective Juror 7859), and had not been in the minority on a hung jury (as had Prospective Juror 0383).

Defendant also argues that the prosecution failed to excuse a non-black juror who was dismissed from a jury for an asthma attack.[4] The juror stated that she had served on three juries, two that were dismissed and one that came to a verdict, and that she had no concerns about sitting on the jury. She never requested that an accommodation be made for her asthma and did not mention her asthma as something that would prevent her from sitting effectively.

Defendant contrasts Prospective Juror 0308, with juror number 8 (previously seated as juror 15), a non-black juror who served on a hung jury. The situations differ in important respects, however. Prospective Juror 0308 sat on only one jury, and was in the minority when it reached a deadlock. The empanelled juror, on the other hand, had served on three juries, two of which reached a verdict, and he was in the majority on the hung jury.

---

[4] Although defendant does not specify, he appears to refer to the juror who was seated as number 16.

The reasons given for excusing the black prospective jurors would not apply equally to the non-black jurors who were not dismissed. Also, as the trial court pointed out, several non-black jurors with conflicts that could not be easily accommodated were dismissed as well.[5] Our review of the record demonstrates that the trial court made "'a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered'" and its conclusions are therefore "'entitled to deference on appeal.'" (*Lenix*, *supra*, 44 Cal.4th at p. 614, quoting *People v. Burgener* (2003) 29 Cal.4th 833, 864.)

***Sufficiency of the Evidence***

Defendant contends the evidence is insufficient to prove his attempted carjacking of Holguin (count 1), the gun use enhancement associated with that count, and his conviction for criminal threats against Wall (count 7). Defendant's contentions with respect to count 1 fail. However, we agree with defendant that the evidence was insufficient to support his conviction for criminal threats against Wall in count 7.

The Fifth and Sixth Amendments, which apply to the states through the Fourteenth Amendment, require the prosecution to prove all elements of a crime beyond a reasonable doubt. (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 277-278.) A conviction supported by insufficient evidence violates the Due Process Clause of the Fourteenth Amendment and must be reversed. (*Jackson v. Virginia* (1979) 443 U.S. 307, 318.) "'In reviewing the sufficiency of evidence . . ., the question we ask is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."' [Citations.] . . . 'In determining whether a reasonable trier of fact could have found defendant guilty beyond a reasonable doubt, the appellate court "must . . . presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."' [Citation.]

---

[5] Non-black Prospective Jurors 9639 and 5761 had conflicting appointments and were dismissed by the prosecution.

13

The same standard also applies in cases in which the prosecution relies primarily on circumstantial evidence. [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1175 (*Young*).)

We review the record in the light most favorable to the prosecution to determine whether the challenged conviction is supported by substantial evidence, meaning "evidence which is reasonable, credible, and of solid value." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) "[M]ere speculation cannot support a conviction." (*People v. Marshall* (1997) 15 Cal.4th 1, 35.) Nor does a finding that "the circumstances also might reasonably be reconciled with a contrary finding . . . warrant reversal of the judgment." (*People v. Proctor* (1992) 4 Cal.4th 499, 528-529.) The reviewing court does not reweigh the evidence, evaluate the credibility of witnesses, or decide factual conflicts, as these are the province of the trier of fact. (*People v. Culver* (1973) 10 Cal.3d 542, 548; *In re Frederick G.* (1979) 96 Cal.App.3d 353, 367.) "Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*Young*, *supra*, 34 Cal.4th at p. 1181.)

**Carjacking of Holguin (count 1)**

Holguin was driving on the evening of August 24, 2012, when he saw defendant crash a minivan into the curb. Holguin parked his car and walked approximately 20-25 yards to the crashed car to see if anyone was hurt. He told his passengers, Solis and Watanabe-Roland, to stay in the car. Holguin was concerned that there could be children in the minivan who needed help. He approached the vehicle from the passenger side and looked into the back. He did not see anyone inside. He then walked around the back of the minivan and along the driver's side. Defendant got out of the minivan, but did not appear to notice Holguin was there. Holguin heard a pop, which he identified as a gunshot, and saw defendant's hand in his pocket.[6] Defendant walked towards Holguin's

---

[6] Defendant may have shot himself in the leg.

14

car. Holguin knew something was wrong and yelled at his friends to run. Defendant climbed into the driver's seat of Holguin's car and brandished the gun, ordering Solis, who was in the passenger's seat, and Watanabe-Roland, who was in the back seat, to get out. They fled the vehicle. Defendant was unable to start the car because Holguin still had the keys. He began yelling something about the keys. Holguin and his friends ran to a nearby police station.

Section 215, subdivision (a) provides: "'Carjacking' is the felonious taking of a motor vehicle in the possession of another, from his or her person or immediate presence, or from the person or immediate presence of a passenger of the motor vehicle, against his or her will and with the intent to either permanently or temporarily deprive the person in possession of the motor vehicle of his or her possession, accomplished by means of force or fear."

Pursuant to section 21a: "An attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission."

Here, defendant contends there is insufficient evidence to establish that he used force or fear, attempted to take the vehicle from Holguin's immediate presence, or had a specific intent to carjack the vehicle from Holguin accompanied by a direct but ineffectual act. There is no merit to these arguments.

First, there is substantial evidence for a jury to conclude defendant used force or fear to attempt the carjacking. The jury could infer from the evidence presented that defendant fired a gun he was holding in his pocket. Holguin became aware of the gun when he heard a noise that he identified as a gunshot. He believed that defendant was dangerous and stayed back, yelling to his friends to run. The fear that defendant instilled in him by carrying and discharging the gun forced Holguin to abandon his vehicle and flee to the police station. But for his fear of harm by defendant, Holguin would have returned to his vehicle and continued driving with his friends. The jury's finding that defendant used force or fear in attempting to take the vehicle is supported by the evidence.

15

There is also substantial evidence to support the finding that defendant intended to take the vehicle from Holguin's immediate presence. "Immediate presence" encompasses the area in proximity to the vehicle. (*People v. Medina* (1995) 39 Cal.App.4th 643, 647-651 (*Medina*); *People v. Hoard* (2002) 103 Cal.App.4th 599, 608-609 [vehicle taken from owner's immediate presence when she was forced to relinquish her keys while inside a store although the vehicle was taken from the parking lot].) "'Section 215 does not require that the victim be inside or touching vehicle at time of the attempted taking.' [Citation.]" (*People v. O'Neil* (1997) 56 Cal.App.4th 1126, 1131.) Holguin was standing beside the minivan defendant had just exited, only a short distance away from his parked car, where the vehicle would have been within his "reach or control such that possession could be retained if [he] was not overcome by fear." (*Medina*, *supra*, at p. 650.)

Moreover, we find no merit in defendant's argument that substantial evidence does not support the immediate presence finding because there was insufficient evidence of a confrontation. Evidence was presented that defendant discharged a gun while standing a few feet away from Holguin, walked toward Holguin's car causing Holguin's friends to flee the vehicle, and got into the front seat shouting something about the keys, which Holguin retained. Persons outside the vehicle have been held to be victims of carjacking in similar instances. In *People v. Coryell* (2003) 110 Cal.App.4th 1299, a female passenger witnessed the beating of the vehicle's driver while the driver was outside of the vehicle. Although she fled the vehicle without any direct confrontation with the defendant, the Court of Appeal concluded that: "she witnessed defendant . . . beat [the driver], threaten him with a knife, and chase him away. [The passenger] reasonably feared for her own safety; defendant's acts directly caused her to abandon the vehicle." (*Id*. at p. 1303.) The same reasoning applies here. Holguin witnessed defendant moving toward his car with a loaded, operable gun, and then scaring his friends out of the vehicle. Defendant's actions were the direct cause of Holguin's decision to abandon the vehicle.

Finally, there is substantial evidence to support the finding that defendant intended to take the car from Holguin. Defendant's arguments on this point simply rehash his

16

previous contentions that he did not use force or fear and did not attempt to take the car from Holguin's immediate presence. As we discussed, both of those arguments fail. To the extent that defendant argues that he was unaware of Holguin, the record contains substantial evidence to the contrary. Holguin walked over to the vehicle defendant had crashed. The jury could reasonably infer that defendant saw him do so. He shouted to his friends while within earshot of defendant, so it would be reasonable to believe defendant heard him. Additionally, when defendant reached the car there were passengers but no driver present. The jury could infer that defendant would have realized that the driver was the person who was shouting for the passengers to run.

**Gun Use Enhancement (count 1)**

Section 12022.53, subdivision (b) provides, in pertinent part: "Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a), personally uses a firearm, shall be punished by an additional and consecutive term of imprisonment in the state prison for 10 years. The firearm need not be operable or loaded for this enhancement to apply." "'Personal use of a firearm may be found where the defendant intentionally displayed a firearm in a menacing manner *in order to facilitate the commission of an underlying crime*.' (*People v. Carrasco* (2006) 137 Cal.App.4th 1050, 1059, emphasis added.)" (*People v. Thiessen* (2012) 202 Cal.App.4th 1397, 1405.) "[A] firearm is displayed when, by sensory perception, the victim is made aware of its presence." (*People v. Jacobs* (1987) 193 Cal.App.3d 375, 381.)

Here, the jury could infer that defendant intentionally placed his hand in his pocket and fired the gun. While the outcome of his actions may not have been as defendant planned, it is reasonable to believe that the actions themselves were intentional, particularly in light of the fact that defendant brandished the gun to the passengers of Holguin's car just minutes later to force them to abandon the vehicle. Holguin heard the

gunshot, and was thus aware of the gun's presence. Substantial evidence supports the enhancement pursuant to section 12022.53, subdivision (b).

### Criminal Threats Against Wall (count 7)

On the evening of August 24, 2012, Lopez and Wall were standing in a parking lot next to Lopez's car when they saw defendant fleeing from police. The women saw the police and heard them yelling for defendant to stop. Defendant ran up to the women breathing heavily. He passed very close to Wall, who was frightened because defendant was very large and being pursued by law enforcement officers. Defendant was approximately one foot away from Wall when he said either "Hi" or "How are you doing?" Wall did not know whether to take the statement as a threat or not. Defendant went past her and approached Lopez. He demanded Lopez's car keys. When she said that she did not have the keys, he responded, "Give me the keys or I'll kill you." Defendant's back was to Wall when he threatened Lopez, but she heard the word kill and was afraid. The women ran away, and defendant fled to a nearby house.

"Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety" is guilty of criminal threats, in violation of section 422.

Defendant contends there was insufficient evidence that he intended Wall to take his statements as a threat, because he threatened Lopez, not Wall. To sustain a criminal threats conviction, "a defendant [must] intend 'the statement . . . be taken as a threat' by the victim. (§ 422, subd. (a).)" (*People v. Lipsett* (2014) 223 Cal.App.4th 1060, 1065 (*Lipsett*).) No evidence was presented that defendant intended to threaten Wall. The

only words he said to her were either "Hi" or "How are you doing?"  His back was to Wall when he threatened  Lopez, and he stated that he would kill Lopez if Lopez did not surrender her keys.  He did not confront Wall, demand anything of her, or threaten her with any type of harm.

*Lipsett*, *supra*, 223 Cal.App.4th 1060, on which the Attorney General relies, is distinguishable.  There, the defendant was struggling with the victim over a bicycle while yelling to his companion to shoot the victim's German Shepherd.  The court held that substantial evidence supported the criminal threats conviction because the jury could reasonably infer that the threat was directed to the victim to encourage him to relinquish the bike.  Here, there was no condition that Wall could meet to prevent the harm, defendant was not struggling with or confronting her, and, in fact, had his back to her.  He directly addressed the threat and the condition to Lopez.  There is insufficient evidence to support the finding that defendant intended for Wall to take his words as threatening her.  The conviction on count 7 must be reversed.

### *Duty to Instruct on Accident*

Section 26 mandates that a person cannot have committed a crime if they "commit[ ] . . . the act . . . by accident, when it appears that there was no evil design, intention, or culpable negligence."  Defense counsel requested a pinpoint instruction on accident with respect to defendant's convictions of assault with a deadly weapon in counts 20 and 21.  The trial court granted the request and told counsel to draft the language and submit it to the court.  Counsel failed to do so.  Defendant contends that the trial court erred in failing to sua sponte instruct the jury on accident, or alternately, that his counsel rendered ineffective assistance.  Both arguments fail.

The trial court has no duty to sua sponte instruct on accident, because the defense "'"amounts to a claim that the defendant acted without forming the mental state necessary to make his or her actions a crime."'"  (*People v. Lawson* (2013) 215 Cal.App.4th 108, 115, quoting *People v. Jennings* (2010) 50 Cal.4th 616, 674.)  We know

19

of no precedent holding that a trial court is obligated to ensure defense counsel follows through on drafting an instruction it has requested, and we decline to impose any further duties on the trial court in this case.

Moreover, a trial court's duty to instruct extends only to "general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case." (*People v. Martinez* (2010) 47 Cal.4th 911, 953.) Here, the defense of accident was unsupported by the evidence. Defendant drove directly toward Fuentes and Villagomes at high speed while evading arrest in a stolen car. He was in the midst of a crime spree in which he committed multiple carjackings and attempted carjackings, and threatened numerous people, some at gunpoint. The women escaped only because they were able to jump out of the way. Defendant took no action to avoid them. After assaulting them, defendant attempted to steal Fuentes's van. There is simply nothing in the record to indicate that defendant's actions were anything but purposeful.

Defendant's ineffective assistance of counsel claim fails because counsel's performance was not deficient, and because defendant was not prejudiced by counsel's failure to draft an accident instruction. As we discussed, defendant's claim of ineffective assistance is premised on counsel's failure to request jury instruction to which defendant was not entitled. Counsel's performance is not deficient if the evidence does not support giving the instruction, as was the case here. (*People v. Dennis* (1998) 17 Cal.4th 468, 541-542 [claim of ineffective assistance premised on failure to request jury instruction must fail where defendant was not entitled to such instruction].)

Finally, to establish prejudice on a claim of ineffective assistance of counsel, the accused must show a reasonable probability that but for the allegedly deficient performance "the result of the proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 694 ; *People v. Ledesma* (1987) 43 Cal.3d 171, 217-218.) Here, the jury was instructed under CALCRIM No. 875 that defendant was not guilty of assault with a deadly weapon unless: "1. The defendant did an act with a deadly weapon that by its nature would directly and probably result in the application of force to a person; [¶] 2. The defendant did that act willfully; [¶] 3. When the defendant

20

acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone." It was further instructed pursuant to CALCRIM No. 252 that assault with a deadly weapon requires that the prosecution prove defendant committed the act with wrongful intent. The jury was charged to consider the instructions together as a whole, and we assume that it understood and followed those instructions (*People v. Thompson* (2010) 49 Cal.4th 79, 138). The instructions made clear that defendant's actions had to be intentional to sustain a conviction. Thus, the jury's verdicts encompass the findings that defendant did not accidentally assault the two victims, and there is no reasonable probability that the outcome would have been different if an instruction on accident had been given.

### *Burden of Proof*

Defendant contends that the prosecutor committed misconduct in closing argument by misstaing the prosecution's burden of proof beyond a reasonable doubt, effectively lessening its burden. Alternately, defendant argues trial counsel rendered ineffective assistance by failing to object below, thereby forfeiting his claim. Both arguments lack merit.

In closing argument, the prosecution stated: "Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction of the truth of the charge. I'm sure that clears up everything for everyone; and, essentially, what we're talking about is, if you are comfortable with your decision, abiding conviction. Tomorrow, next day, the day after that, that you are going to be comfortable with whatever your decision is in this case. [¶] When we talk about proof beyond a reasonable doubt, it's important that you hold the people to that standard but that you also don't expect more, that you don't say, 'I'm not a hundred percent sure. I need to be a hundred percent sure. Otherwise, I can't come to a decision.' That means you can have some doubt in some of the charges but it has to be a reasonable doubt." Defense counsel made no objection to the prosecution's characterization of the burden of proof.

Subject to certain exceptions not applicable here, "'[a]s a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]' [Citation.]" (*People v. Hill* (1998) 17 Cal.4th 800, 820 (*Hill*), overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) We therefore hold that defendant has forfeited his claims. Because defendant advances an ineffective assistance claim; however, we address the merits of his contention to decide whether trial counsel's representation was objectively deficient, and whether but for counsel's errors, defendant would have received a more favorable result. (*People v. Waidla* (2000) 22 Cal.4th 690, 718.)

"'"[A] prosecutor is given wide latitude during argument."'" (*People v. Ward* (2005) 36 Cal.4th 186, 215.) This latitude is not without bounds, however. "'[I]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements. [Citation.]' [Citation.]" (*Hill*, *supra*, 17 Cal.4th at pp. 829-830.) Where, as in this case, an allegation of prosecutorial misconduct "'"focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." [Citation.]' [Citations.]" (*People v. Carter* (2005) 36 Cal.4th 1215, 1263-1264.) "'In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]' [Citation.]" (*People v. Brown* (2003) 31 Cal.4th 518, 553-554.)

Defendant has not demonstrated that the prosecutor's comments misstated the law or otherwise resulted in prejudice; he has not shown there was a reasonable possibility the jury construed or applied the prosecutor's comments in an objectionable manner. It is not reasonably likely that the jury understood the prosecutor's statements as lessening the burden of proof. The "beyond a reasonable doubt standard" was referred to several times

in argument, and the prosecutor's comments taken as a whole convey both that the jury's conviction must be of a "lasting, permanent nature" and that the conviction must be "strongly" and "deeply" held. (*People v. Brigham* (1979) 25 Cal.3d 283, 290-291.) The jury was instructed that it must find each element of the crime true beyond a reasonable doubt (CALCRIM No. 220), that the prosecution bore the burden of proof (CALCRIM No. 103), and to the extent that an attorney's arguments conflicted with the instructions, it was to follow the instructions (CALCRIM No. 200). The jury is presumed to understand and follow the instructions of the trial court. (*People v. Archer* (1989) 215 Cal.App.3d 197, 204.) Absent some affirmative indication in the record to the contrary, we presume the jury followed the instructions given. (*People v. Holt* (1997) 15 Cal.4th 619, 662.) The trial court's instructions on the reasonable doubt standard, the prosecution's burden of proof based on it, and the specific instruction to ignore any contrary argument, would have cured any error perceived by defendant. (See *People v. Nguyen* (1995) 40 Cal.App.4th 28, 36-37.) As defendant cannot establish prejudice, he cannot establish ineffective assistance of counsel. (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1126.)

*Custody Credit*

The Attorney General concedes, and we agree, that defendant is entitled to one additional day of custody credit. Defendant was arrested on August 24, 2012, and sentenced on September 9, 2013. He is therefore entitled to 382 days of actual custody credit and 57 days of good conduct credit, rather than the 381 days of actual custody credit and 57 days of good conduct credit, which the trial court awarded. (See, e.g., *People v. Magallanes* (2009) 173 Cal.App.4th 529, 537 [actual credit includes day of arrest and day of sentencing].)

## DISPOSITION

The conviction in count 7, a violation of section 422, is reversed. The trial court is directed to modify the judgment to credit defendant with 382 days of presentence custody credits. The court shall prepare an amended abstract of judgment deleting the conviction and sentence in count 7 and correcting the amount of custody credits, and forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.


KRIEGLER, J.

We concur:


MOSK, Acting P. J.


MINK. J. *

---

* Retired judge of the Los Angeles County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.